IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| RICHARD C. ANGINO and ALICE K. ANGINO, ANGINO & LUTZ, P.C., ANGINO & ROVNER, P.C., KING DRIVE CORP., A LA CARTE ENTERPRISES, INC.,<br><br>      Plaintiffs,<br><br>    v.<br><br>BB&T, SUSQUEHANNA BANK, MCNEES, WALLACE AND NURICK, LLC., RAYMOND GRANGER, GEOFFREY SHUFF,<br><br>      Defendants | CIVIL ACTION NO.<br><br>(JUDGE _____ )<br><br>JURY TRIAL DEMANDED |

## COMPLAINT

### PARTIES

1. Richard C. and Alice K. Angino are husband and wife, with Richard being the sole officer and shareholder of Angino & Lutz, P.C. (formerly Angino & Rovner, P.C.), and Richard and Alice being sole officers and shareholders of King Drive Corp., and A la Carte Enterprises, Inc.

2. Richard C. Angino is a civil litigation attorney, and his wife, Alice K. Angino is the office manager and administrator of the law firm of Angino & Lutz, P.C. (formerly Angino & Rovner, P.C.). In addition to their law firm, the Anginos have two corporations, King Drive Corp. and A la Carte Enterprises, Inc. which are part of the Anginos' plan to create a green, sustainable, resort community.

3.     The Anginos reside in Dauphin County, Pennsylvania, and Angino & Lutz, P.C. (formerly Angino & Rovner, P.C.), King Drive Corp., and A la Carte Enterprises, Inc. have their principal places of business in Dauphin County, Pennsylvania.

4.     BB&T previously Susquehanna Bank, previously Graystone Bank is one of the largest banks in the United States and currently the fourth largest bank in the Commonwealth of Pennsylvania.   BB&T does business in central Pennsylvania.

5.     McNees, Wallace and Nurick, LLC, is the largest law firm in Dauphin County and perhaps in central Pennsylvania, has numerous banking clients including BB&T and Susquehanna Bank. It does business in central Pennsylvania.

6.     Raymond Granger is currently a Senior Vice President for BB&T and formerly a Senior Vice President of Susquehanna Bank and acted in the scope of his employment for Susquehanna Bank with respect to loan "workout" transactions involving Plaintiffs.

7.     Geoffrey Shuff  is an attorney, employee and agent of McNees, Wallace & Nurick, LLC and has been involved in the loan "workout" transactions pertaining to Plaintiffs that have taken place since 2012, early 2013 to the present.

## JURISDICTION AND VENUE

8.     This Court has diversity jurisdiction because Plaintiffs are citizens of Pennsylvania and BB&T has its corporate office and principal place of business in a state other than Pennsylvania, and the monetary amount of the claim exceeds the jurisdictional limit.  Also the banking industry including BB&T are regulated by the federal government and Congress has passed significant legislation following the worst recession since the Great Depression including HAMP, Dodd Frank, and substantial additional oversight to prevent a repeat.  There may therefore by federal issues in addition to diversity.

## FACTUAL BACKGROUND

9.     Since the 1960s, Richard C. and Alice K. Angino have worked together at Angino & Lutz (formerly Angino & Rovner) in the practice of law and created an enviable reputation throughout the state with respect to civil litigation, trial and appellate court practice and earning income.  Richard and Alice Angino through their corporations, King Drive and A La Carte have invested virtually all of their income and assets to create and develop a  "green," "sustainable" "resort" development.

10.     The Anginos and their law firm have since the 1960s given millions of dollars to the local community as well as Richard's college and law school and supported major campaigns and annual giving for virtually all of the health and welfare organizations with contributions of at least 10% of net income and on at

least one occasion 10% of the gross income of the Anginos and their law firm. They have established trust funds that continue to contribute $50,000-$60,000 annually to the local community. There is a $631,000 trust fund at the Penn State Hershey Medical Center, Frederick Michael Angino Pediatric Leukemia Memorial Fund, a $625,000 fund with respect to the foundation for enhancing communities and a trust fund at Franklin and Marshall College. As of 2012 when Susquehanna acquired Graystone, Plaintiffs had a respected standing in the central Pennsylvania community.

11.    The Anginos and their corporations in 2002 had acquired and were developing 850 acres including their home, which had an Italian garden which was used for weddings and special events, a 56 acre Willow Lake Development, a 750 acre resort, and associated "green sustainable" multi-use development.

12.    Although Richard and Alice Angino and their law firm have earned substantial income from the practice of law, they have always leveraged their substantial assets by financing their acquisitions and utilizing lines of credit for business operations related to Angino & Rovner, King Drive, and A La Carte.

13.    In 2002, Plaintiffs had in excess of $13 million in loans with First Union (later Wachovia) that provided financing for the Anginos' acquisition, development, and operation of their land holdings and law firm, including:

(a)    $2.31 million mortgage on their 2040 Fishing Creek Valley home;

(b)   $1.2 million mortgage on their South Carolina second home (ocean front property);

(c)   $6,185,261 first mortgage with respect to their Felicita Resort property;

(d)   $1,781,250 associated with the Silver Spring Willow Lake development;

(e)   $1,000,000 mortgage on Angino & Rovner law office;

(f)   Angino & Rovner line of credit, $500,000 and

(g)   A La Carte line of credit, $500,000.

14.    Richard C. and Alice K. Angino continued with their $2.31 million mortgage on their 2040 Fishing Creek Road home 12(a).

15.    At Santander's request, Santander became Plaintiffs' bank with respect to Plaintiffs' $1.2 million mortgage on their South Carolina second home 12(b), replacing First Union's $1.2 million mortgage with a $1.2 million mortgage and a $650,000 second business loan for a total of $1,850,000. Santander replaced the (c) $6,185,261 first mortgage with respect to the Felicita Resort property and (g) A La Carte line of credit of $500,000 with a $5,000,000 Felicita Resort mortgage requiring $200,000 per year plus interest mortgage payments, replacement of the $500,000 A La Carte line of credit and the addition of a $500,000 King Drive line of credit. In 2007, Santander also replaced the (d) $1,781,250 development loan with Silver Spring Willow Lake Development in 2004 and 2005 with a $1,400,000 development loan, and a $98,000 letter of credit.

16.     Plaintiffs' relationship with BB&T and Susquehanna commenced with their predecessor, Graystone Bank in 2006 and related primarily to the mortgage on the Angino & Rovner law office, and the Angino & Rovner line of credit.

17.     In 2006, Graystone Bank became the Anginos' bank with the Angino & Rovner law firm, and the 4503 North Front Street, Angino & Rovner law office building with  a $600,000 12/22/06 new loan to replace (f) Angino & Rovner line of credit $500,000. **Exhibit A.**  The new loan had an interest rate of 8.2500% and a maturity date of 2/22/07. **Exhibit A.**

18.     The new loan had an existing obligation balance of $569,000-$658,000 from 1/31/07-2/9/07 at 7.75%.  **Exhibit B.**

19.     On December 18, 2006, Graystone issued a commitment letter to Angino & Rovner, P.C. for a $1,000,000 revolving line of credit. **Exhibit C.**

20.     On February 2, 2007, Graystone issued a commitment letter for a $2,200,000 mortgage fixed 7.59% for five years on the 4503 North Front Street Law Office Building. **Exhibit D.**

21.     Angino & Rovner, P.C., by Richard C. Angino, President signed a demand Promissory Note with Graystone Bank on February 15, 2007 for the principal amount of $1,000,000.   **Exhibit E.**

22.     "VARIABLE INTEREST RATE. The interest rate on this Note is subject to change from time to time based on changes in an index which is

Lender's Prime Rate (the "Index")… The interest rate to be applied to the unpaid principal balance during this Note will be at a rate of 0.250 percentage points under the Index." **Exhibit E.**

23.     On February 15, 2007, Richard C. Angino and Alice K. Angino signed a Promissory Note in the principal amount of $2,200,000 commencing on March 15, 2007 with interest only payments until 2009, commencing in the year 2009 and continuing each year thereafter until maturity. Borrower was required to pay annual principal payments in the amount of $100,000 from February 15, 2007 until February 15, 2012. The interest rate was 7.59%. After February 15, 2012, the rate will return to Graystone Bank's Prime Rate plus 1%. **Exhibit F.**

24.     The Plaintiffs and Graystone intended for the $600,000 of the $1,000,000 loan to be used to pay Graystone for the prior $600,000 loan and the remaining $400,000 of the $1,000,000 loan/line to continue to be utilized as working capital. The $1,000,000 loan was never intended to be a traditional line of credit that would be paid completely on an annual basis and fluctuate widely during the course of the year. the $1,000,000 line was intended and because of the Anginos and their development corporations utilizing the funds for land acquisitions and developments. Rather, the $1,000,000 Line was intended and used by the Anginos and their corporations to fund acquisitions and development. The Parties' intention in this regard is demonstrated from documents commencing

April 2007. See the range of the line from $458,000 to $787,000 for the month of April 2007. **Exhibit G.**

25.     The intentions of the Parties is further demonstrated by the range of the line as being $588,000 to $756,000 in 2007,   $618,000-$837,000 in 2008. **Exhibit H.**

26.     On February 26, 2009, Angino & Rovner entered into a Change in Terms Agreement with Graystone continuing with the $1,000,000 principal amount, continuing with a variable interest rate of Prime Rate plus 1%, but including a floor of 6%. **Exhibit I.**

27.     Three months later, Angino & Rovner and Graystone entered into another Change in Terms Agreement on May 6, 2009 reducing the interest rate floor to 5% effective January 16, 2009. **Exhibit J.**

28.     The intentions of the Parties to have a base or permanent loan of $600,000 and $400,000 available for working capital is evidenced by the loan billing statement of 12/31/09 where the range of the principal balance of the line/loan was from $640,000 to $828,000. **Exhibit K.**

29.     The Parties agreed to a change in the $2,200,000 mortgage payment schedule on March 11, 2011 at the time when the mortgage was $2,100,000 to substitute $10,000 a month principal payments rather than prior agreement $100,000 per year after 2009 until maturity. **Exhibit L.**

30.    At the Angino & Rovner's request for additional funds above the $1,000,000, Graystone agreed to have the loan/ line increased by $250,0000 to $1,250,000 as of March 11, 2011. **Exhibit M.**

31.    The utilization of the line for acquisitions and development is evidenced by Graystone's  demands of March 11, 2011 to have the loan/line secured by the Anginos' home and King Drive development property.

32.    Graystone required additional collateral to secure the increase of the line from $1,000,000 to $1,250,000 by a second mortgage on the Anginos' home and the encumbrance of Highpoint Circle Lots 14, 15, 17 and 18. **Exhibit M**.

33.    In accordance with the intentions of the Parties, and particularly in keeping with the increase in the line of credit from $1,000,000 to $1,250,000 secured by the Anginos' home and Highpoint Circle Lots, the line of credit from 12/30/11 to 1/31/12 ranged from $785,000 to $933,000. **Exhibit N**.

34.    The weekend of February 18, 19, and 20, 2012, Graystone Bank became Susquehanna Bank. **Exhibit O**.

35.    Raymond Granger of Susquehanna Bank was assigned as the Senior Vice President, loan "workout" individual following the Susquehanna takeover and immediately disregarded  the intentions of the Parties, the purposes of the line, the history of the line's use, and the utilization of the line for the Angino's acquisition and development.

36.    From the beginning, Raymond Granger made demands to reduce the line which at the time was $1,250,000.

37.    From the beginning, Raymond met with Richard Angino and started every conversation with a demand that the five year loan line had to be changed to a traditional line with a pay off each year , and line limited to working capital with the Angino & Rovner law firm.

38.    Raymond Granger from the beginning made   demands of the Plaintiffs that if not fulfilled Susquehanna would not continue with the line.

39.    Plaintiffs had no alternative, but to agree to Raymond Granger's demands because as of 2012 what happened in the worst recession since the Great Depression, and the Plaintiffs' experience with Santander, a bank that had financed Plaintiffs' land acquisitions and development, refinancing with another bank was not an option.

40.    Raymond Granger began making demands in 2012, knowing at the time that Santander had called $6.4 million of Plaintiffs' loans on May 5, 2010 based solely upon two year maturity dates of the 2007 security agreements between Plaintiffs and Santander.

41.    In competition with Santander, Raymond Granger attempted in every way possible to accelerate,  cross-collateralize and acquire as much collateral as possible to support the Angino & Rovner line and Richard Angino and Alice K. Angino's mortgage.

42.     Raymond Granger starting in late 2012, early 2013 coerced changes that deprived Plaintiffs of the benefit of their agreements, reasonable expectations and intention and contrary to the five year history of interpreting the $1,250,000 loan/line as a line of credit that permitted full use to the $1,250,000 limit each and every year.

43.     Based upon the leverage of continuing to finance the Angino & Rovner loan/line of credit, Raymond Granger coerced the signing of the January 31, 2013 forebearance agreement by Richard C. Angino and Alice K. Angino.

> NOW THEREFORE, in consideration of the indebtedness evidenced by the Note, the covenants and agreements set forth in the Loan Agreement and this Mortgage, and other good and valuable consideration, the receipt of which is hereby acknowledged, and to secure (i) the performance and observance by Borrower of all of the covenants and agreements on the part of Borrower to be performed or observed under the Loan Agreement, (ii) the payment of all monies evidenced by the Note and secured hereby, (iii) any sums advanced by Mortgagee pursuant to any of the provisions of this Mortgage or the Loan Agreement, (iv) any further loans that may be made by Mortgagee to Borrower or Mortgagor, (v) all obligations and liabilities of Borrower or Mortgagor under interest rate swap agreements, interest rate cap agreements and interest rate collar agreements, and all other agreements or arrangements with Mortgagee designed to protect Borrower against fluctuations in interest rates or currency exchange rates, and (vi) the performance or observance by Mortgagor of its covenants and agreements hereinafter set forth (all of the foregoing being hereinafter collectively called the "Obligations"), Mortgagor, intending to be legally bound, does hereby grant, bargain, sell, convey, warrant, assign, transfer, mortgage, pledge, grant a security interest in and set over and confirm unto Mortgagee, and its successors and assigns, all of its estate, right, title, interest, property, claim and demand, now or hereafter arising,

571138 11

in and to the following property and rights (all of Mortgagor's estate and interests therein, now or hereafter arising, being hereinafter collectively called the "Mortgaged Property"):....

**Exhibit P.**

44.    The January 31, 2013 forbearance agreement required the reduction of the $1,250,000 loan/line of credit to be temporarily reduced to $1,100,000 and then permanently reduced to $1,000,000. **Exhibit P.**

45.    Twenty-two days later on February 22, 2013, Raymond Granger coerced Richard C. Angino, President of King Drive Corporation to sign under duress a $400,000 mortgage and simultaneously reduce the $1,000,000 line to $600,000. The $400,000 mortgage was secured by additional parcels of land owned by King Drive Corporation. The first two pages of the 55 page document are attached as **Exhibit Q.**

46.    Raymond Granger demanded and coerced the Anginos and King Drive Corporation to add 200 acres of land owned by King Drive Corporation to the collateral that Susquehanna already had with respect to Plaintiffs' home and the Highpoint Circle Lots. The first two pages of the 55-page document are attached as **Exhibit Q**.

47.    Raymond Granger has given the values of the Highpoint Circle Lots and the 200 acres at approximately $2,000,000. **EXHIBIT R**. This was in addition to Susquehanna's lien on the individual Plaintiffs' home.

4503 North Front Street - $1,200,000 appraised May 2015
88 acres Fishing Creek - $750,000 appraised Aug 2015
112 acres Fishing Creek - $670,000 – appraised Aug 2015
Lot#14 - $110,000 appraised Dec 2014
Lot#17 - $136,000 appraised Dec 2014
Lot#18 - $185,000 appraised Dec 2014
Lot#15 - $190,000 appraised Dec 2013

48.    Susquehanna although reducing the line from $1,250,000 to $600,000 and requiring a $400,000 mortgage, did not release the Anginos' home, the Highpoint Circle properties that were pledged as collateral for the $1,250,000 loan.

49.    The $400,000 term loan note dated February 22, 2011, but actually entered into and signed in 2013, required payments beginning March 1, 2013 and to continue until February 28, 2015 ("maturity date") with principal and interest of 6% in equal installments of $4,441.00.  First two pages of the 22 page document. **Exhibit S.**

50.    Although the $400,000 firm note was signed on  February 22, 2013, and had a maturity date of February 28, 2015,  Raymond Granger on May 1, 2014, on behalf of Susquehanna Bank required another Modification and Amendment of Loan Documents and Forbearance Agreement requiring Angino & Lutz, P.C., formerly known as Angino & Rovner, P.C., King Drive Corp., A La Carte Enterprises, Inc., Blue Mt. Golf Club, Inc.,  and Alice K. Angino and Richard C. Angino, jointly, to become Guarantors or "Obligors", referencing a forbearance

agreement 3 months earlier of January 2, 2014, on the basis that the Obligors have requested the Lender to extend from April 30, 2014 until May 30, 2014 (1 month) under which the amount available under the line of credit would be $700,000. **Exhibit T.**

51.     One year after the May 1, 2014 modification and amendment, on March 18, 2015, Raymond Granger coerced another term loan modification on the basis that the $400,000 had matured and become made payable on February 28, 2015 to continue the loan to February 28, 2016. **Exhibit U.**

52.     In addition to all of his other demands, Raymond Granger demanded that Plaintiffs sign deeds for almost $2,000,000 of collateral that would permit Susquehanna to sell one or more parcels of the 200 acres plus the Highpoint Circle Lots at prices determined by Susquehanna and for unspecified reasons.

53.     Plaintiffs sought copies of the actual appraisals, but Raymond Granger denied same contending that they were proprietary. See email of October 31, 2015. **Exhibit V.** "You banks are all alike." **Exhibit V.**

54.     Plaintiffs attempted to sell two of the Highpoint Circle Lots that Susquehanna had as collateral with respect to the 2011 $1,250,000 line which had been reduced to $600,000 line and $400,000 mortgage.

55.     Raymond Granger demanded that any sale of the Highpoint Circle Lots and/or the 200 acres and presumably individual Plaintiffs' home be applied

to the remaining $330,000 owed on the $400,000 loan and any other debt including presumably the mortgage on the office to remove the debt <u>permanently</u>.

56.     Raymond Granger stated that the basis for requiring <u>permanent</u> removal of debt was the line being stagnant with only a $200,000 fluctuation with the rest being generally called permanent working capital. See **Exhibit W.**

57.     Raymond Granger refused to recognize that $600,000 of the original $1,000,000 and then $1,250,000 loan or line was for permanent working capital.

58.     Raymond Granger mischaracterized $600,000 of the line of credit which was intended as permanent working capital, utilized as permanent working capital and for the 6 years before Susquehanna took over, ranged from $600,000 -- $1,250,000 to be reduced to zero.

59.     Richard Angino's email of October 17, 2015 summarized his impression as to what happened.

**FROM:**     Richard Angino
**SENT:**     Saturday, October 17, 15 8:43 PM
**TO:**     Raymond Granger; Alice Angino
**SUBJECT:**     $400,000 loan
        I have been thinking as to what happened. You first obtained an increase of $200,000 from $1 million to $1.2 million and then back to $1 million. You then said I had to move $400,000 from the Line to a loan of $400,000 collateralized by what 1 thought was 400 acres. I gave deeds for what I thought was the 400 acres. Recently when I sold Geisel lots I learned there was a $1,250.000 lien. You now said there may be $1,750,000 lien. The banks attorney prepared all the documents. Alice and I signed them. I never had an attorney involved. You said you had an appraisal that ascribed very little value to the 400 acres. I provided you with an appraisal of $1 million for 89 acres. Please provide me with the loan documents prepared by your attorneys and the appraisals. I am entitled to them particularly under Dodd Frank because you have signed deeds to sell residential property and I don't have copies of the deeds,

documents or appraisals. You went so far as to threaten to foreclose when I was late this summer because there was a delay in getting court approval of million dollar settlements. We are now waiting end of December for payment of CAT Fund settlements with $350,000 of fees.

When you get $95,000 from the sale of lot 15 does that come off the $330,000 I owe on the $400,000 loan or from $1,250,00 or $1,750,000 or what? We have had meetings and we will have one when I get back from vacations but I need documents not conversation. A $3.2 million mortgage and Line secured by the office building is now I know what secured by what with what consideration. I suggest you share these E-Mails with the attorney who prepared the documents and give me the banks position on documents, appraisals and deeds. I have been a victim of Santander, Wells Fargo and now BB & T. You have refused to supply time and time again in the past. I am entitled to what the bank has including a chronology of my account and E-Mail communications between and among the individuals and attorneys involved except for advice given. I started with a small bank and now part of one of the largest banks in Pa and even the country.

## Exhibit X.

60.     Raymond Granger admitted that Susquehanna had appraisals of the collateral not including the Anginos' home of approximately $2,000,000 plus deeds to permit Susquehanna to sell the properties, but yet refused to provide copies of the appraisals without the Anginos paying for same and demanding that any and all sales be applied to the Angino & Lutz and King Drive debt.

61.     At Richard Angino's request, Geoffrey Shuff on 10/23/2015 stated the bank's position.

> From; "Shuff, Geoffrey"
> Date: 10/23/2015 2:47 PM (GMT-05:00)
> To: Richard Angino
> Cc: 'Raymond Granger', "Davidson, Clayton"
> Subject;
>
> Mr. Angino:
>
> This is being sent by us at the request of Susquehanna Bank ("Bank") as a response to your emails, and all future

communications should be between or among the respective parties' attorneys. Communications to the Bank should be directed to Geoffrey S. Shuff and Clayton W. Davidson using the contact information at the end of this email. We are under the impression that you are representing yourself and the other obligors in this matter. However, If that is not the case, please provide us ASAP with the name(s) and contact information for the attorney(s) who will be representing you and the other obligors in this matter.

According to the terms of the loan and forbearance documents, all of the debt of all of the obligors to the Bank is cross-defaulted and cross-collateralized. So, the loan for the office, the line of credit and the $400,000 term loan (jointly and severally, the "Obligations") are all secured by the following collateral, among any and all other collateral provided for in the loan and/or forbearance documents:

Anqinos
North Potato Valley Road (No. 43-036-008)
Lot 14 Geisel High Point Circle (No. 43-036-107)
2040 Fishing Creek Valley Road (No. 43-036-028)
4305 North Front Street (No. 62-006-022)
Assignment of Life Insurance Policy

King Drive Corp.
Geisel High Point Circle - Lot 18 (No. 43-036-005), Lot 15 (No. 43-036-108), Lot 17 (No. 43-036-124)
1765 South Fishing Creek Valley Road (No. 43-040-011)
Lot 5 Fishing Creek Valley Road (No. 43-040-115)
Lot 6 Fishing Creek Valley Road (No. 43-040-116)

Law practice
Security interest in and lien upon assets.

Furthermore, the Forbearance Agreement that was signed as of January 2, 2014, to address the defaults of the obligations to the Bank provides that the Bank may, in its sole discretion, determine to which of the Obligations any amount received on account of the Obligations, such as the proceeds from the sales of the Geisel lots, is applied. The Bank has determined that the sale proceeds from the upcoming sales of the Geisel lots on October 29, 2015, should be applied to the $400,000 term loan rather than the line of credit. In the alternative, at your request the Bank will apply the proceeds to the line of credit, provided that a modification agreement that reduces the amount available

under the line of credit by an amount equal to the amount of the proceeds received by the Bank is signed before settlement of the sales.

As to the Deeds in Lieu of Foreclosure, the Bank will return those to you shortly.

As to appraisals, while the Bank has furnished you with appraised values of properties, it is not required to do so or to furnish you with copies of appraisals that the Bank has obtained, which are the property of the Bank. However, the Bank would consider furnishing you with a copy of any appraisal, provided you first reimburse the Bank for the cost of the appraisal and sign appropriate documentation. In any event, if you need current appraisals of your property for you own purposes, you should order them yourself.

As to any "plan to correct inappropiate [sic] changes to 2007 Agreement", none of the changes that has been made to the Obligations has been incorrect or inappropriate, so the Bank does not currently have any such plan or any intention to formulate any such plan.

As to the payments of and amounts that comprise your debt to the Bank, you have already been provided with that information in the periodic statements that you have received.

**Exhibit Y.**

62.    Susquehanna recognized that refinancing with another bank is not an option at the present time and under the present circumstances and feels that they can do whatever they want with impunity.

## FIRST CAUSE OF ACTION

### BREACH OF CONTRACT, FAILURE TO FULFILL THE PARTIES' INTENTIONS AND REASONABLE EXPECTATIONS, WAIVER AND ESTOPPEL, COERCION, AND ADHESIONARY TERMS, AND VIOLATING THEIR DUTY OF GOOD FAITH

63.    Plaintiffs had agreements with Graystone that commenced in 2006

and continued until Susquehanna took over Graystone in 2012 with respect to a $2.2 million mortgage between Richard C. and Alice K. Angino and Graystone and $1,250,000 line of credit between Angino & Rovner, P.C. and Graystone.

64.     The $1,250,000 line of credit was intended from the beginning in 2006 and 2007 to provide $600,000 of permanent working capital and the balance of the $400,000 eventually $650,000 to be used as month to month working capital.

65.     Plaintiffs' agreements with Graystone as to the original $1,000,000 line and eventually $1,250,000 line was to utilize the line for the Angino & Rovner line for the Anginos' acquisition of, and development of properties through King Drive and A La Carte.

66.     From 2006 up until 2012, the Plaintiffs and Graystone never intended for the $600,000 permanent working capital or balance of $400,000 eventually $650,000 to be paid each year.

67.     The reasonable expectations and intentions in 2007 and 2011 agreements verify, collaborate and support the Parties' intentions and responsible expectations with the line of credit almost always being within $200,000-$400,000 of the maximum $1,250,000.

68.     BB&T/Susquehanna's breached the Parties' agreements by the coerced changes including demanding $2,000,000 of collateral, pre-signed deeds, refusing to provide appraisals, demanding that sales of collateral permanently

reduce Plaintiffs' debt with respect to the $400,000 loan that had been reduced to $330,000, the $600,000 line, and the $2,200,000 mortgage that had been reduced to $1,600,000 all of which resulted in Plaintiffs not only losing the benefit of their bargain, but incurring consequential and incidental damages including late fees, badgering by Raymond Granger, major effects upon Plaintiffs' reputation and credit rating, inability to purchase on credit, having credit card limits reduced, paying higher fees, being unable to make timely payments on Plaintiffs' office mortgage and other debt, and having insufficient funds to operate the law office and Plaintiffs' developments.

69.    Plaintiffs are entitled to obtain equitable relief requiring that BB&T be ordered to reinstate the $1,250,000 line, and permit Plaintiffs to utilize the entire line as intended and as same was utilized prior to Susquehanna's takeover.

70.    Susquehanna/BB&T breached the parties' February 2007 loan and line of credit with Graystone Bank and the history of the Parties' actions including the Change in Terms Agreement March 11, 2011 by violating the Parties' intentions and good faith by demanding without consideration the January 31, 2013 Open-End Mortgage and Security Agreement. The mortgage secures future advances [Forbearance Agreement February 22, 2011]. The February 22, 2013 Open-End Mortgage and Security Agreement. This Mortgage secures future advances [presumably another Forbearance Agreement]. The Modification and Amendment Loan Documents and Forbearance Agreement, May 1, 2014 and

March 1, 2015 as referenced in the Statement of Facts, and referenced Exhibits.

71.    Defendants' conduct is outrageous and entitles Plaintiffs to punitive damages in excess of the diversity amount and equitable relief in declaring Defendants' demands for the 2013, 2014 and 2015 changes in the original agreement are void and unenforceable.

WHEREFORE, Plaintiffs request damages in excess of the diversity limit, compensatory and punitive damages, and equitable relief.


## SECOND CAUSE OF ACTION

## CIVIL CONSPIRACY

72.    Defendants BB&T, Susquehanna Bank, their law firm McNees, Wallace & Nurick, Raymond Granger and Geooffery Shuff conspired from the date of the Susquehanna takeover in 2012 to the present to deprive Plaintiffs of their contract rights, reasonable expectations and the intentions of the Parties as referenced by a five year history and including the February 2007 and March 11, 2011 agreements. This was accomplished by Raymond Granger and Susquehanna demands and supported by McNees, Wallace & Nurick, in Geoffrey Shuff's documents to reduce the $1,250,000 line to a $600,000 line that has to paid off completely each year.

73.    The Defendants conspired to add Parties and assets as collateral and demands that the sale of the collateral would result in a permanent reduction of the

$400,000 loan which is currently about $330,000, the $600,000 line and the $2.2 million mortgage which is now less than $1,600,000. The $600,000 line which is now less than $500,000, and the $2.2 mortgage.

74.     The conspiracy between BB&T/Susquehanna and McNess, Wallack and Nurick has resulted in the Plaintiffs having insufficient operating funds to pay the rent on 4503 North Front Street mortgage for a period of time in 2015, and occasionally in prior years as made  Plaintiffs' payments on their home mortgage to fall in arrears, and has had an substantial impact on the Anginos' enviable reputation and credit rating, and causing Plaintiffs' home mortgage to fall in arrears, and caused a substantial impact on the Anginos' enviable reputation and credit rating.

75.     The outrageousness of the Parties is expressed in Geoffrey Shuff's email of 10/23/2015, 2:47 p.m.:

> The Bank is not willing to increase the existing Obligations or make any additional loan{s) to you and/or your related entities, or make any change to its collateral. The fact that property is appraised at a certain amount does not mean the property will realize the appraised amount in the marketplace. However, there is nothing that prohibits you and your related entities from; (a) selling property, provided such property is sufficient to pay off all applicable liens against such property, or (b) refinancing with another bank.

**Exhibit Y**

WHEREFORE, Plaintiffs request damages in excess of the diversity limit, equitable relief, compensatory and punitive damages.

Respectfully submitted,

ANGINO & LUTZ, P.C.


_/s/ *Richard C. Angino*____
*Richard C. Angino, Esquire*
I.D. No. 07140
4503 N. Front Street
Harrisburg, PA  17110
Phone:  (717) 238-6791
Fax:  (717) 238-5610
rca@anginolutz.com
Attorney for Plaintiffs

Date:  November 2, 2015