## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **RICHARD ANGINO and ALICE ANGINO, et al.,** | : : : | **CIVIL NO. 1:15-CV-2105** |
| **Plaintiffs,** | : : | **(Chief Judge Conner)** |
| **v.** | : : | **(Magistrate Judge Carlson)** |
| **BB&T BANK,** | : : | |
| **Defendant.** | : | |

## REPORT AND RECOMMENDATION

### I.    Statement of Facts and of the Case

This lawsuit, which comes before us for consideration of three motions–a motion to dismiss, filed by the defendant, and motions for preliminary and permanent injunctive relief file by the plaintiffs– is one of several cases[1] brought by the plaintiffs against various financial institutions arising out of a common core of operative facts. The plaintiffs in this action are Richard Angino, a local attorney, his spouse, Alice Angino, his law firm, and several corporations owned and operated by the Anginos.

---

[1]See Angino v. Santander Bank, Civ No. 1:15-CV-438; Angino v. Santander Bank, Civ. No. 1:15-CV- 1145; Angino v. Wells-Fargo Bank, Civ. No. 1:15-CV- 418.

(Doc. 1, ¶¶1-2.)  The sole remaining defendant in this action, BB&T,[2] is a bank which has lent more than $2,000,000 to the Anginos, and their various businesses, over the years.  These loan agreements have been modified numerous times by the parties, and these agreed-upon modifications now lie at the heart of this lawsuit, which seeks to un-do the current agreements between the parties, direct that the parties return to what the Anginos have described as their original understanding and agreement prior to 2007, and award compensatory and punitive damages to the Anginos.  (Id., ¶¶70-71.)

In support of this unusual prayer for relief, the plaintiffs' complaint alleges that the Anginos have for many years enjoyed an extraordinarily successful law practice and "created an enviable reputation throughout the state with respect to civil litigation." (Id., ¶9.)  The Anginos, through various corporations, have also invested virtually all of their income to create and develop green, sustainable, resort communities.  (Id.)  According to the plaintiffs, as part of their business strategy, the Anginos "have always leveraged their substantial assets by financing their acquisitions and utilizing lines of credit for business operations. . . ." (Id., ¶12.)  Adopting this high-risk, high-reward business financing model, by 2002 the plaintiffs had in excess of $13,000,000 in loans with First Union Bank, loans that financed a variety of

---

[2]The Anginos had initially named a number of other individual and institutional defendants, but have now voluntarily dismissed all of the defendants except for BB&T.  (Docs.6 and11.)

projects and developments, including several luxury homes, business lines of credit, and commercial mortgages for resort and residential developments. (Id., ¶13.)

The Anginos allege that they began a business banking relationship with BB&T and Susquehanna, through its corporate predecessor, Graystone Bank, in 2006. At that time the plaintiffs' relationship with the bank consisted of a mortgage on the Angino law firm offices and a law firm line of credit. (Id., ¶¶16-17.) Over time, the amount of this indebtedness grew, as the law firm line of credit increased to $1,000,000 by 2007, and the bank provided the Anginos with a $2,2000,000 mortgage on their law office. (Id., ¶¶19-22.) This mortgage, negotiated by the Anginos with the bank, entailed interest-only until 2009, followed by principal and interest payments at a variable rate after 2009. (Id., ¶23.)

According to the Anginos their original intent was to treat this $1,000,000 line of credit in a fashion different than traditional lies of credit. In particular, the Anginos claim that the "$1,000,000 line was never intended to be a traditional line of credit that would be paid completely on an annual basis and fluctuate widely during the course of the year." (Id., ¶24.) Rather, the Anginos seem to have just intended to use the line of credit to fund their various projects on an on-going basis without any fixed repayment obligation on their part. (Id.)

The complaint then recites that these two sophisticated parties engaged in a series of loan modifications between 2009 and 2011. (Id., ¶¶24-29.) These loan

modifications took place against the backdrop of a severe financial recession, a recession which created extraordinary hardship for the plaintiffs who were now unable to sustain the millions of dollars in debt which they had previously elected to incur. By March of 2011, the Anginos sought an increase in their line of credit with the bank, from $1,000,000 to $1,250,000. While the bank agreed to this modification, it now sought additional collateral from the Anginos in the form of a second mortgage on other properties belonging to the plaintiffs. (Id., ¶¶30-33.)

In 2012, Graystone Bank was acquired by Susquehanna Bank, and the plaintiffs began dealing with a senior vice president at Susquehanna Bank, Raymond Granger, who they identify as a loan "workout" specialist, a term which suggests that the bank now viewed the Anginos' indebtedness as distressed loans. (Id., ¶35.) According to the Anginos, at this time the bank also began to make demands of them which had deviated from their past business practices with this financial institution. Thus the bank sought to have the Anginos pay down and reduce their $1,250,000 line of credit, and indicated that they would not be able to renew that line of credit in the future without some reduction in this indebtedness or further security. (Id., ¶¶36-39.)

The complaint makes it clear that these actions by the bank were compelled by financial hardships the plaintiffs were experiencing in their highly leveraged businesses in the wake of the economic recession of 2009. At that time a number of the Anginos' loans with other banks were coming due and those banks were calling

in their loans.  For example, the Anginos owed $6,400,000 to another financial institution, Santander Bank, in 2012 which had called its loans.  (Id., ¶40.) Recognizing its own financial peril with respect to its outstanding loans to the Anginos caused by the actions of these other banks, BB&T attempted to accelerate, and collateralize its mortgage and line of credit with the Anginos, as well as calling for annual repayment of the line of credit.  (Id., ¶¶41-42.)

These efforts were manifested in a series of agreements executed between the parties, albeit agreements which the Anginos assert they were coerced into signing due to their grave financial straits.  Thus, in January of 2013, the parties entered into a forbearance agreement, which reduced this line of credit from $1,250,000 to $1,000,000. (Id., ¶¶43-44.)  In February 2013, the parties agreed to further reduce the line of credit from $1,000,000 to $600,000.  The parties achieved this goal through the execution of a $400,000 mortgage secured by real property, and used these proceeds to reduce the unpaid balance of the line of credit.  (Id., ¶¶44-48.)  While BB&T obtained this addition security for its indebtedness, the bank declined to release any assets previously pledged as collateral on prior loan.  (Id., ¶48.)  Moreover, the $400,000 mortgage executed by the parties had a maturity date of February 2015, two years from the date if this loan agreement.  (Id., ¶49.)  Thus, the Anginos still faced a substantial impending financial liability as a result of this 2013 agreement.

As this deadline approached the bank and the Anginos entered into a series of further loan modification agreements.  First, in May of 2014 the forbearance and loan agreements were modified to add guarantors on these loans, and change to duration of the loan agreements.  (Id., ¶50.)  Ten months later, in March of 2015, the parties signed yet another loan modification agreement, which extended the term of the $400,000 loan between the Anginos and the bank, but required that the Anginos agree to pledge further real estate as collateral and consent to the bank selling various properties to pay off this indebtedness.  (Id., ¶¶51-52.)

In the Fall of 2015 the Anginos and the bank became embroiled in further financial disputes.  These disputes were multi-faceted, with the parties disagreeing regarding how funds derived from real estate sales should be applied to the various debts owed by the plaintiffs, and arguing about appraisals for this real estate.  (Id., ¶¶55-61.)  In the context of these disagreements, the Anginos demanded the rescission of the loan modification agreements which they had entered into with the bank between 2013 and 2015.  The bank declined to rescind these agreements, and this lawsuit ensued.

In its current form the Anginos' complaint brings two claims against BB&T. First, the Anginos have alleged a cause of action which conflates several theories of contractual liability and is cast as a claim for breach of contract, failure to fulfill expectations, waiver and estoppel, coercion, "adhesionary" [sic]  terms and breach of

the duty of good faith.  (Id., ¶¶63-71.)  This claim seeks to:  (1)  reverse the financial history of these parties; (2) un-do a series of loan modification agreements executed by the parties over the past three years; (3) return the financial arrangement between the plaintiffs and the bank to what the plaintiffs considered that arrangement to be in 2007, namely, an open-ended $1,000,000 financing commitment; and (4) compel the bank to pay compensatory and punitive damages for refusing to rescind the current existing contracts between the parties.  (Id.)  The plaintiffs' second cause of action is a civil conspiracy claim against the bank and a law firm, which alleges in a summary fashion that the bank's effort to secure the Anginos' debts through the pledging of additional collateral, and the repayment of previously borrowed funds had a conspiratorial quality to it, entitling the Anginos to damages and injunctive relief. (Id., ¶¶72-75.)

These claims are echoed in two other pleadings filed by the Anginos, motions seeking preliminary and permanent injunctions against the bank.  (Docs. 16-17.) These motions are unaccompanied by any brief, and have a certain enigmatic quality to them, but appear to seek a court order which would un-do the prior agreements entered into between these parties between 2013 and 2015; unilaterally impose the Anginos' past expectations arising from prior dealings in 2007 upon the parties; require BB&T to forego rights which it has under its existing agreements with the

plaintiffs; and require the bank to extend credit to the plaintiffs, something it is no longer willing to do.

The defendants have responded to these pleadings by moving to dismiss the Anginos' complaint, (Doc. 12.), and opposing the plaintiffs' motions for injunctive relief.  These motions are now fully briefed by the parties, and are, therefore, ripe for resolution.  For the reasons set forth below, it is recommended that the defendant's motion to dismiss be granted, and the plaintiffs' motions for injunctive relief be denied.

## II.     Discussion

### A.     Rule 12(b)(6)– The Legal Standard

BB&T has filed a motion to dismiss this complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure, which provides that a complaint should be dismissed for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  With respect to this benchmark standard for legal sufficiency of a complaint, the United States Court of Appeals for the Third Circuit has recently aptly noted the evolving standards governing pleading practice in federal court, stating that:

> Standards of pleading have been in the forefront of jurisprudence in recent years.  Beginning with the Supreme Court's opinion in Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (12007) continuing with our opinion in Phillips [v. County of Allegheny, 515 F.3d 224, 230 (3d Cir. 2008)] and culminating recently with the Supreme Court's decision in Ashcroft v. Iqbal –U.S.–, 129 S.Ct. 1937 (2009) pleading standards have

seemingly shifted from simple notice pleading to a more heightened form of pleading, requiring a plaintiff to plead more than the possibility of relief to survive a motion to dismiss.

Fowler v. UPMC Shadyside, 578 F.3d 203, 209-10 (3d Cir. 2009).

In considering whether a complaint fails to state a claim upon which relief may be granted, the court must accept as true all allegations in the complaint and all reasonable inferences that can be drawn from the complaint are to be construed in the light most favorable to the plaintiff. Jordan v. Fox Rothschild, O'Brien & Frankel, Inc., 20 F.3d 1250, 1261 (3d Cir. 1994). However, a court "need not credit a complaint's bald assertions or legal conclusions when deciding a motion to dismiss." Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 906 (3d Cir. 1997). Additionally a court need not "assume that a ... plaintiff can prove facts that the ... plaintiff has not alleged." Associated Gen. Contractors of Cal. v. California State Council of Carpenters, 459 U.S. 519, 526 (1983). As the Supreme Court held in Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), in order to state a valid cause of action a plaintiff must provide some factual grounds for relief which "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of actions will not do." Id. at 555. "Factual allegations must be enough to raise a right to relief above the speculative level." Id. As the Supreme Court held in Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), in order to state a valid cause of action a plaintiff must provide some factual grounds for relief which "requires more than labels and

conclusions, and a formulaic recitation of the elements of a cause of actions will not do." Id. at 555.  "Factual allegations must be enough to raise a right to relief above the speculative level."  Id.

In keeping with the principles of Twombly, the Supreme Court has underscored that a trial court must assess whether a complaint states facts upon which relief can be granted when ruling on a motion to dismiss.  In Ashcroft v. Iqbal, 556 U.S. 662 (2009), the Supreme Court held that, when considering a motion to dismiss, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Id. at 678.  Rather, in conducting a review of the adequacy of complaint, the Supreme Court has advised trial courts that they must:

> [B]egin by identifying pleadings that because they are no more than conclusions are not entitled to the assumption of truth.  While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.  When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

Id. at 679.

Thus, following Twombly and Iqbal a well-pleaded complaint must contain more than mere legal labels and conclusions.  Rather, a complaint must recite factual allegations sufficient to raise the plaintiff's claimed right to relief beyond the level of mere speculation.  As the United States Court of Appeals for the Third Circuit has stated:

[A]fter Iqbal, when presented with a motion to dismiss for failure to state a claim, district courts should conduct a two-part analysis. First, the factual and legal elements of a claim should be separated. The District Court must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions. Second, a District Court must then determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a "plausible claim for relief." In other words, a complaint must do more than allege the plaintiff's entitlement to relief. A complaint has to "show" such an entitlement with its facts.

Fowler, 578 F.3d at 210-11.

As the court of appeals has observed: "The Supreme Court in Twombly set forth the 'plausibility' standard for overcoming a motion to dismiss and refined this approach in Iqbal. The plausibility standard requires the complaint to allege 'enough facts to state a claim to relief that is plausible on its face.' Twombly, 550 U.S. at 570, 127 S.Ct. 1955. A complaint satisfies the plausibility standard when the factual pleadings 'allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.' Iqbal, 129 S.Ct. at 1949 (citing Twombly, 550 U.S. at 556, 127 S.Ct. 1955). This standard requires showing 'more than a sheer possibility that a defendant has acted unlawfully.' Id. A complaint which pleads facts 'merely consistent with' a defendant's liability, [ ] 'stops short of the line between possibility and plausibility of "entitlement of relief." ' " Burtch v. Milberg Factors, Inc., 662 F.3d 212, 220-21 (3d Cir. 2011) cert. denied, 132 S. Ct. 1861, 182 L. Ed. 2d 644 (U.S. 2012).

In practice, consideration of the legal sufficiency of a complaint entails a three-step analysis: "First, the court must 'tak[e] note of the elements a plaintiff must plead to state a claim.' <u>Iqbal</u>, 129 S.Ct. at 1947. Second, the court should identify allegations that, 'because they are no more than conclusions, are not entitled to the assumption of truth.' <u>Id.</u> at 1950. Finally, 'where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief.' <u>Id.</u>" <u>Santiago v. Warminster Tp.</u>, 629 F.3d 121, 130 (3d Cir. 2010).

In undertaking this task, the court generally relies only on the complaint, attached exhibits, and matters of public record. <u>Sands v. McCormick</u>, 502 F.3d 263, 268 (3d Cir. 2007). The court may also consider "undisputedly authentic document[s] that a defendant attached as an exhibit to a motion to dismiss if the plaintiff's claims are based on the [attached] documents." <u>Pension Benefit Guar. Corp. v. White Consol. Indus.</u>, 998 F.2d 1192, 1196 (3d Cir. 1993). Moreover, "documents whose contents are alleged in the complaint and whose authenticity no party questions, but which are not physically attached to the pleading, may be considered." <u>Pryor v. Nat'l Collegiate Athletic Ass'n</u>, 288 F.3d 548, 560 (3d Cir. 2002); <u>see also</u>, <u>U.S. Express Lines, Ltd. v. Higgins</u>, 281 F.3d382, 388 (3d Cir. 2002) (holding that "[a]lthough a district court may not consider matters extraneous to the pleadings, a document integral to or explicitly relied upon in the complaint may be considered without converting the

motion to dismiss in one for summary judgment.")  However, the court may not rely on other parts of the record in determining a motion to dismiss.  <u>Jordan v. Fox, Rothschild, O'Brien &Frankel</u>, 20 F.3d 1250, 1261 (3d Cir. 1994).

### B. <u>As Currently Pleaded  This Complaint Fails to State a Claim Upon Which Relief May Be Granted</u>

#### 1. <u>The Plaintiffs Have Not Alleged Viable Breach of Contract Claims</u>

At the outset, in Count I of their complaint the plaintiffs have alleged a cause of action which conflates several theories of contractual liability and is cast as a claim for breach of contract, failure to fulfill expectations, waiver and estoppel, coercion, "adhesionary" [sic] terms and breach of the duty of good faith. (<u>Id.</u>, ¶¶63-71.) On the basis of these allegations, the Anginos seek wide-ranging relief which would:  (1) reverse the financial history of these parties; (2) un-do a series of loan modification agreements executed by the parties over the past three years; (3) return the financial arrangement between the plaintiffs and the bank to what the plaintiffs considered that arrangement to be in 2007, namely, an open-ended $1,000,000 financing commitment; and (4) compel the bank to pay compensatory and punitive damages for refusing to rescind the current existing contracts between the parties.  (<u>Id.</u>)

While cast, in part, as a breach of contract claim, this characterization is something of a misnomer since the plaintiffs do not allege a breach of their current

agreements with BB&T, which are embodied in a series of loan modification agreements. Instead, they seek to negate these agreements, re-write the history of these past dealings, and substitute their perception of their past working relationship with the bank for the current contractual realities of that relationship.[3]

As a federal court exercising diversity jurisdiction in this case, we are obliged to apply the substantive law of Pennsylvania to this dispute. Chamberlain v. Giampapa, 210 F.3d 154, 158 (3d. Cir. 2000). The legal principles governing the interpretation of contracts under Pennsylvania law are familiar and well-settled. To prevail on a claim for breach of contract under Pennsylvania law, a plaintiff must

---

[3]This invitation by the plaintiffs to have the Court refashion the agreement between the parties to what the plaintiffs describe as the prior status of those agreements, in turn, exposes an apparent, but unintended, irony in the plaintiffs' theory of this case. The plaintiffs have asked to reshape their current business arrangements to conform with what they claim to be some past understandings between the parties. However, when the defendant attempted to provide the Court with what seems to be an undisputed, and authentic, copy of a prior loan modification agreement in order to show that there has been not been any breach of these past understandings, the Anginos objected to any consideration of this prior written loan modification agreement on the grounds that the agreement was not attached to the complaint. Thus, it seems that the plaintiffs wish to have us reshape their business relationship in conformance with prior agreements between the parties, but object to us knowing what those prior written agreements actually stated. While this position has a certain hollow formalism to it, and ignore the proposition that "documents whose contents are alleged in the complaint and whose authenticity no party questions, but which are not physically attached to the pleading, may be considered," Pryor v. Nat'l Collegiate Athletic Ass'n, 288 F.3d 548, 560 (3d Cir. 2002), we need not address this issue since the plaintiffs' claims fail on multiple independent legal grounds.

plead the following elements:  (1) the existence of a contract, including its essential terms; (2) defendant's breach of duty imposed by the terms; and (3) actual loss or injury as a direct result of the breach.  See Diodato v. Wells Fargo Ins. Servs., USA, 44 F. Supp. 3d 541, 556 (M.D. Pa. 2014).  Furthermore, the legal benchmarks applied to contract interpretation are also clearly established.  Initially, "[w]hen a written contract is clear and unequivocal, its meaning must be determined by its contents alone."  Mellon Bank, N.A. v. Aetna Bus. Credit, Inc., 619 F.2d 1001, 1010 (3d Cir. 1980) (citation omitted); Mace v. Atl. Ref. & Mktg. Corp., 785 A.2d 491, 496 (Pa. 2001).  A contract is ambiguous only if it is reasonably susceptible to different constructions and capable of being understood in more than one sense.  St. Paul Fire & Marine Ins. Co. v. Lewis, 935 F.2d 1428, 1431 (3d Cir. 1991).  Under Pennsylvania law, ambiguous contracts are interpreted by the trier of fact, and unambiguous contracts are interpreted by the court as a matter of law.  Mellon Bank, 619 F.2d at 1011 n.10.

The United States Court of Appeals for the Third Circuit has aptly summarized Pennsylvania law regarding the interpretation of contractual language and terms:

> The fundamental rule in interpreting the meaning of a contract is to ascertain and give effect to the intent of the contracting parties.  The intent of the parties to a written agreement is to be regarded as being embodied in the writing itself.  The whole instrument must be taken together in arriving at contractual intent.  Courts do not assume that a contract's language was chosen carelessly, nor do they assume that the parties were ignorant of the meaning of the language they employed.

> When a writing is clear and unequivocal, its meaning must be determined
> by its contents alone.  Only where a contract's language is ambiguous
> may extrinsic or parol evidence be considered to determine the intent of
> the parties.  A contract contains an ambiguity if it is reasonably
> susceptible of different constructions and capable of being understood in
> more than one sense.  This question, however, is not resolved in a
> vacuum.  Instead, contractual terms are ambiguous if they are subject to
> more than one reasonable interpretation when applied to a particular set
> of facts.  In the absence of an ambiguity, the plain meaning of the
> agreement will be enforced.  The meaning of an unambiguous written
> instrument presents a question of law for resolution by the court.

Great Am. Ins. Co. v. Norwin Sch. Dist., 544 F.3d 229, 243 (3d Cir. 2008) (internal

citation omitted) (citing Murphy v. Duquesne Univ., 777 A.2d 418, 429-30 (Pa.

2001)).  Furthermore, courts must, whenever possible, read contract provisions so as

to avoid ambiguity.  Id. at 247.  Where a contract is not ambiguous, but is instead

subject to only one reasonable interpretation, it is appropriate for a district court to

resolve the issue of interpretation as a matter of law.  See Norfolk S. Ry. v. Reading

Blue Mountain & N. Ry., 346 F. Supp. 2d 720, 725 (M.D. Pa. 2004).

Applying these legal benchmarks, we find that the Anginos' breach of contract

failure to fulfill expectations, waiver and estoppel, coercion, "adhesionary" [sic] terms

and breach of the duty of good faith claims, as currently pleaded, fail as a matter of

law on several scores.  Indeed, there is an intellectually elusive quality to these breach

of contract claims which stems from a single source:  This count ignores the terms of

actual, existing, current agreements between these parties and instead asks us to re-write and rescind these current written agreements in a number of material respects.

We cannot ignore the terms of these written agreements when considering this breach of contract claim.  Further, when we consider the actual contracts between these parties, we find that each of the forbearance agreements executed by the parties recited that the bank was providing valuable consideration to the plaintiffs in the form of forbearance of its legal rights, in return for various actions by the plaintiffs, actions which included paying down outstanding indebtedness, collateralization of loans, and agreement to new repayment terms.  Further, these agreements were set forth in integrated written contracts, contracts which on their face reflect a voluntary, mutual agreement between two financially sophisticated parties.  In addition, each of the written, integrated loan modification agreements executed by these parties contained express releases in favor of the bank, releases which provided as follows:

> Release and Indemnification.  The Borrower, for itself and any person or entity claiming by, through, from or under it, including without limitation its predecessors, successors and assigns, and the respective owners, subsidiaries and affiliates of Borrower and its predecessors, successors and assigns, and the stockholders, directors, officers, members, managers, partners, trustees, beneficiaries, heirs, personal representatives, employees, agents, insurers and attorneys of any of them, hereby releases and agrees to indemnify, defend and hold harmless the Bank and its predecessors, successors and assigns, and its and their respective owners, subsidiaries and affiliates, and the stockholders, directors, officers, members, managers, partners, trustees, beneficiaries, heirs, personal representatives, employees, agents, insurers and attorneys

of any of them from, against and for any and all1iability of any nature whatsoever in connection with or arising out of or relating to the Loan, the Collateral, the Borrower in its capacity as Borrower, the Loan Documents, this Agreement, or the matters referred to in the Loan Documents or this Agreement, including without limitation any demand, claim, suit, proceeding or action of any nature whatsoever, and any damage, loss, cost, expense and fee (including attorneys' fees) or other liability of any nature whatsoever.

Presented with these agreements, which contain express releases, we note that, when construing the terms of a general release, federal courts in Pennsylvania are guided by Pennsylvania law. Three Rivers Motor Co. v. Ford Motors Co., 522 F.2d 885, 892 (3d Cir. 1975). Moreover, "in Pennsylvania, the general rule for construction of releases is that the intention of the parties must govern, but this intention must be gathered from the language of the release. Evans v. Marks, 421 Pa. 146, 218 A.2d 802 (1966). A signed release is binding upon the parties unless executed and procured by fraud, duress, accident or mutual mistake. Kent v. Fair, 392 Pa. 272, 140 A.2d 445 (1958)." Id. When construing the effect of a general release: "First, a court must look to the language of the release. In examining the language of a release, the terms of the release will be given their ordinary meaning unless a different meaning was clearly intended. In addition, the language of the release must be viewed in the context of the entire document. See, e.g., Harrity v. Medical College of Pennsylvania Hosp., 439 Pa.Super. 10, 21, 653 A.2d 5 (1994). Each part of the release must be given effect." Bickings v. Bethlehem Lukens Plate, 82 F.Supp.2d 402, 405 (E.D.Pa., 2000)(some

citations omitted).  Thus, a party may not pick and choose only those portions of a release that are convenient and seek selective enforcement of a release.

Furthermore, a party, who seeks to set aside a general release on grounds of duress, coercion or mutual mistake must allege facts which make a particularly exacting showing.  Thus, "A party asserting mutual mistake must show that a mistake was made by *all* parties to the release.  See 8 Pennsylvania Law Encyclopedia § 84 ('A mutual mistake is one common to both or all parties ...').  Cf. Miller v. Houseworth, 387 Pa. 346, 127 A.2d 742, 744 (1956) ('A person who seeks to rectify a deed on the ground of mistake must establish, in the clearest and most satisfactory manner, that the alleged intention to which he desires it to be made conformable continued concurrently in the minds of all parties down to the time of its execution.') (citations omitted).  In addition, '[r]eformation of the release would require a showing of ... mutual mistake by clear, precise, and convincing evidence.'  Wolbach v. Fay, 488 Pa. 239, 412 A.2d 487, 488 (1980)."  Crestar Mortg. Corp. v. Shapiro 937 F.Supp. 453, 460 (E.D.Pa. 1996)(emphasis in original).  Similarly, claims of coercion and duress made by parties seeking to avoid responsibilities under a general release are also subject to careful scrutiny.  It is clear that:

> In Pennsylvania, a release is effective absent fraud, duress, accident or mutual mistake.  Buttermore v. Aliquippa Hosp., 522 Pa. 325, 329-30, 561 A.2d 733, 735 (1989); Holmes v. Lankenau Hosp., 426 Pa.Super. 452, 627 A.2d 763, 767 (1993), app. denied, 538 Pa. 671, 649 A.2d 673

(1994); <u>Popovich v. Empire Beauty Schs., Inc.</u>, 567 F.Supp. 1440, 1442 (E.D.Pa.1983).   Duress is not found when there is simple financial pressure.  <u>Three Rivers Motors Co. v. Ford Motor Co.</u>, 522 F.2d 885, 893 (3d Cir.1975).  Rather, the pleader must allege threats of physical harm to show duress.  <u>Id.</u>  (citing <u>Carrier v. Wm. Penn Broadcasting Co.</u>, 426 Pa. 427, 430-31, 233 A.2d 519 (1967)); <u>Killian v. McCulloch</u>, 873 F.Supp. 938, 943 (E.D.Pa.1995).

<u>Williams v. Stone</u>, 923 F.Supp. 689, 691 (E.D.Pa. 1996).

This rule strictly limiting the ability of a party to avoid the effect of a general release by claiming duress or coercion applies with particular force to claims made by a parties, like the Anginos, who are highly sophisticated legally, and could draw upon great legal expertise when assessing the legal import of the various releases which they signed.  In such instances, " 'Under Pennsylvania law, absent a threat of actual bodily harm, there can be no claim of duress "where the contracting party is free to consult with counsel." ' <u>Cuchara v. Gai-Tronics Corp.</u>, 129 F. Appx. 728, 731 (3d Cir.2005) (quoting <u>Carrier v. Wm. Penn. Broad. Co.</u>, 426 Pa. 427, 233 A.2d 519, 521 (Pa.1967))."  <u>Gregory v. Derry Tp. School Dist.</u> 2010 WL 146332 at *10.  This principle applies with particular force here, where the Anginos represent that they are the principals behind an extraordinarily successful law practice which has "created an enviable reputation throughout the state with respect to civil litigation." (Doc. 1, ¶9.) Given the undisputed, exceptional legal acumen of the plaintiffs, these legally

sophisticated parties are bound by the plain language of these releases which they executed with the bank as part of a comprehensive series of forbearance agreements. The releases are, therefore, entirely enforceable and defeat any breach of contract claim.

The Anginos' prospects on this particular claim do not improve if the claim is cast as a claim for a breach of a duty of good faith. As a general rule allegations of a breach of the covenant of good faith sound in contract, rather than tort. See Creeger Brick & Bldg. Supply, Inc . v. Mid–State Bank & Trust Co., 560 A.2d 151, 153 (Pa.Super.Ct.1989) ("Where a duty of good faith arises, it arises under the law of contracts, not under the law of torts."). As a result, courts have found that the breach of the covenant of good faith is subsumed in a claim for breach of contract. See McHale v. NuEnergy Group, No. Civ. A. 01–4111, 2002 WL 321797, *8 (E.D.Pa. Feb. 27, 2002) (concluding that Pennsylvania law would not recognize a claim for breach of the covenant of good faith and fair dealing as a separate cause of action apart from the breach of contract claim, since the actions forming the basis of the breach of contract claim were essentially the same as those brought in support of the bad faith claim); see also JHE, Inc. v. Se. Pa. Transp. Auth., 2002 WL 1018941, *7 (Pa.Com.Pl. May 17, 2002) ("[A] breach of the covenant of good faith is nothing more than a breach of contract claim and ... separate causes of action cannot be maintained for

each, even in the alternative."); <u>Commonwealth v. BASF Corp.</u>, No. 3127, 2001 WL 1807788, *12 (Pa.Com.Pl. Mar. 15, 2001) ("Pennsylvania law does not allow for a separate cause of action for breach of either an express or implied duty of good faith, absent a breach of the underlying contract."). Rather, under Pennsylvania law, such a duty of fair dealing is entirely dependent upon the existence of a contractual relationship. In short, Pennsylvania law grafts onto all contracts a responsibility by the contracting parties to deal fairly with one another. However, Pennsylvania law does not recognize an independent, and free-standing, duty of fair dealing outside a contractual context. As we have previously explained:

> Whether express or implied, the covenant of good faith and fair dealing acts as a term of the contract, and that covenant arises from the contract itself. <u>See</u> <u>Ash v. Cont'l Ins. Co.</u>, 593 Pa. 523, 932 A.2d 877, 884 (2007); <u>Birth Center</u>, 787 A.2d at 385; <u>Murphy</u>, 777 A.2d at 434 & n. 11; <u>Gray</u>, 223 A.2d at 11 ("We believe that this recent case law, employing contractual terms for the obligation of the insurer to represent in good faith the rights of the insured, indicates that a breach of such an obligation constitutes a breach of the insurance contract for which an action in assumpsit will lie."); <u>Cowden v. Aetna Cas. & Sur. Co.</u>, 389 Pa. 459, 134 A.2d 223, 229 (1957).

> Because the covenant of good faith and fair dealing arises from the contract and not due to the mere relationship of the parties-as, for example, a fiduciary duty-a breach of the covenant sounds in contract, not tort. <u>See</u> <u>Ash</u>, 932 A.2d at 884. There is, however, no independent cause of action for a breach of the covenant of good faith and fair dealing-arising in contract-in Pennsylvania because such a breach is merely a breach of contract. <u>See</u> <u>Birth Center</u>, 787 A.2d at 385-86; <u>Gray</u>,

223 A.2d at 11.  It has been said that a breach of the implied covenant of good faith and fair dealing merges with a breach of contract claim.  <u>See</u> <u>Meyer v. Cuna Mut. Group</u>, No. 03-CV-602, 2007 WL 2907276, at *14-15 (W.D.Pa. Sept. 28) (citing cases).

<u>Zaloga v. Provident Life and Acc. Ins. Co. of America</u>, 671 F.Supp.2d 623, 630-31 (M.D.Pa. 2009).

Since there typically is no separate cause of action under Pennsylvania law for breach of the duties of good faith and fair dealing; <u>Chanel, Inc. v. Jupiter Group, Inc.</u>, Civ. No. 3:04-CV-1540, 2006 U.S. Dist. LEXIS 43363, at *6 (M.D. Pa. June 27, 2006); <u>In re K-Dur Antitrust Litig.</u>, 338 F. Supp. 2d 517, 549 (D.N.J. 2004); <u>Blue Mt. Mushroom Co. v. Monterey Mushroom, Inc.</u>, 246 F. Supp. 2d 394, 400-01 (E.D. Pa. 2002); <u>LSI Title Agency, Inc. v. Eval. Servs., Inc.</u>, 951 A.2d 384, 391 (Pa. Super. Ct. 2008), a claim for breach of the duties of good faith and fair dealing is, at bottom, simply a claim for breach of the underlying contract.  <u>Zaloga v. Provident Life and Acc. Ins. Co. of America</u>, 671 F.Supp.2d 623, 630-631 (M.D.Pa. 2009).  Yet, in this case the Anginos seem to be alleging a breach of the duty of good faith claim, without asserting a clearly articulated breach of the current underlying contracts between themselves and BB&T, contracts which contained express written releases.  This is a fatal flaw and defeats this claim as it is currently pleaded.

In any event, to the extent that some duty of good faith arises in a contractual setting, it is also clear that the scope of that duty in a borrower-lender transaction is narrowly defined and does not entail some legal obligation on the part of the lender to unilaterally agree to undermine, modify or defeat its own legal rights and interests under a commercial agreement.   Thus, "the Supreme Court of Pennsylvania has refused to impose a duty of good faith which would modify or defeat the legal rights of a creditor.   Heights v. Citizens National Bank, 463 Pa. 48, 342 A.2d 738 (1975)." Creeger Brick & Bldg. Supply Inc. v. Mid State Bank & Trust Co., 385 Pa. Super. 30, 36, 560 A.2d 151, 154 (1989)  Likewise:

> It seems reasonably clear from the decided cases that a lending institution does not violate a separate duty of good faith by adhering to its agreement with the borrower or by enforcing its legal and contractual rights as a creditor.  The duty of good faith imposed upon contracting parties does not compel a lender to surrender rights which it has been given by statute or by the terms of its contract.  Similarly, it cannot be said that a lender has violated a duty of good faith merely because it has negotiated terms of a loan which are favorable to itself.  As such, a lender generally is not liable for harm caused to a borrower by refusing to advance additional funds, release collateral, or assist in obtaining additional loans from third persons.

 Creeger Brick & Bldg. Supply Inc. v. Mid State Bank & Trust Co., 385 Pa. Super. 30, 36-37, 560 A.2d 151, 154 (1989).  In short, to the extent that Pennsylvania law recognizes a contractual duty of good faith, "courts have ... refused to apply a duty of good faith to alter or defeat the rights of a creditor which have been granted by law *or*

*contract."* <u>Stewart v. SWEPI, LP</u>, 918 F. Supp. 2d 333, 342 (M.D. Pa. 2013)(emphasis in original).

Fairly construed, the plaintiffs' complaint invites us to do precisely what Pennsylvania law says we cannot do through the rubric of a duty of good faith and fair dealing; that is, require a creditor to alter, defeat, modify, or renounce some contractual rights which it possesses. The all-encompassing duty of good faith asserted by the Anginos in this complaint would also call upon us condemn BB&T for taking actions which the courts have expressly stated it is permitted to take such as "adhering to its agreement with the borrower . . . by enforcing its legal and contractual rights as a creditor;" refusing "to surrender rights which it has been given by statute or by the terms of its contract;" or "negotiat[ing] terms of a loan which are favorable to itself." <u>Creeger Brick & Bldg. Supply Inc. v. Mid State Bank & Trust Co.</u>, 385 Pa. Super. 30, 36-37, 560 A.2d 151, 154 (1989). Since Pennsylvania case law specifically rejects the notion that a lender must surrender its legal rights in order to demonstrate its good faith to its borrower, the Anginos' good faith claim, which is unmoored to any contractual breach by defendants and demands that defendants forego their contractual rights, fails as a matter of law and should be dismissed.

Similarly, the Anginos cannot bolster this claim, as they attempt to do by cataloguing in their complaint a series of doctrines, claims and affirmative defenses

like reasonable expectations, waiver and estoppel, and breach of good faith.  As the Pennsylvania courts have previously informed the Anginos, these types of affirmative defenses under Pennsylvania law do not constitute an independent, free-standing legal claim.  Angino & Rovner, PC v. Santander Bank, N.A., No. 489 MDA 2014, 2015 WL 6405714, at *7 (Pa. Super. Ct. Jan. 28, 2015).  Indeed, the Pennsylvania courts have already specifically rejected the application of the reasonable expectations, waiver and estoppel, impracticability and impossibility doctrines to similar claims leveled by the Anginos against another bank in state court litigation.  Id.  Thus, the Pennsylvania courts have already advised the plaintiffs that they may not transmogrify these breach of contract defenses into quasi-contractual affirmative claims.

More fundamentally, even construed as affirmative defenses to contract liability, these defenses are typically limited to instances of physical impossibility, and not mere fiscal impracticability.  Thus:  "[I]f the allegedly unforeseeable event was in reality a natural and fairly predictable risk arising in the normal course of business, then a court may not dissolve a[n] agreement . . . .  An individual's financial position, for example, cannot generally be an implied 'basic  assumption' of a contract, nor will it excuse a party's performance.  See Restatement (Second) of Contracts § 261 (1981) Comment: b. Basic assumption. Illustration 2 (showing that contracting party's financial situation as result of bank failure does not excuse performance on contract)."  Step Plan Servs.,

Inc. v. Koresko, 12 A.3d 401, 412-13 (Pa. Super. Ct. 2010).  In this case, the well-pleaded facts in the Anginos' complaint reveal that, as part of their business strategy, the Anginos "have always leveraged their substantial assets by financing their acquisitions and utilizing lines of credit for business operations. . . ." (Doc. 1, ¶12.) Having knowingly embraced this high-risk business financing philosophy, the Anginos fell prey to the economic effects of the 2009 recession, their own risky business judgment, and their inability to sustain the debt load which they allege that they deliberately elected to undertake.   While this is a tragic and regrettable circumstance, it is also "a natural and fairly predictable risk arising in the normal course of business, [and does not permit a court to] dissolve a[n] agreement [since]. . . . [a]n individual's financial position, . . . , cannot generally be an implied 'basic assumption' of a contract, nor will it excuse a party's performance." Step Plan Servs., Inc. v. Koresko, 12 A.3d 401, 412-13 (Pa. Super. Ct. 2010).

## 2.    The Plaintiffs' Conspiracy Claims Also Fail as a Matter of Law

In Count II of this complaint, the Anginos allege a civil conspiracy claim, which is pleaded in a conclusory fashion without supporting factual detail.  Moreover, the plaintiffs pursue this civil conspiracy claim in a setting where they are currently electing to sue a single institutional defendant, BB&T Bank.  As pleaded, this civil

conspiracy allegation simply fails to state a claim upon which relief may be granted.

Under Pennsylvania law there are three essential elements to a civil conspiracy claim.

To plead and prove such a claim a plaintiff must allege that:  (1)  two or more persons

acted with a common purpose to commit an illegal act or to commit a lawful act by

unlawful means or for an unlawful purpose, (2) overt action in furtherance of the

common purpose has been taken and (3) actual legal damage has resulted.  Weaver v.

Franklin County, 918 A.2d 194,202 (2007) (citing Brown v. Blaine, 833 A.2d 1166

(2003)).  Moreover:

> [I]n order to plead a civil . . .  action based upon a claim of conspiracy,
> a plaintiff must plead allegations that are:
>
>> supported by facts bearing out the existence of the
>> conspiracy and indicating its broad objectives and the role
>> each defendant allegedly played in carrying out those
>> objectives.  Bare conclusory allegations of "conspiracy" or
>> "concerted action" will not suffice to allege a conspiracy.
>> The plaintiff must expressly allege an agreement or make
>> averments of communication, consultation, cooperation, or
>> command  from which such an agreement can be inferred.

Flanagan v. Shively, 783 F.Supp. 922, 928 (M.D.Pa.1992).  Furthermore,
when pleading a conspiracy claim, a plaintiff cannot rely upon subjective
suspicion and speculation.  Young v. Kann, 926 F.2d 1396, 1405 n. 16
(3d Cir.1991).  Quite the contrary, "to properly plead an unconstitutional
conspiracy, a plaintiff must assert facts from which a conspiratorial
agreement can be inferred. D.R. v. Middle Bucks Area Vocational Tech.
Sch., 972 F.2d 1364, 1377 (3d Cir.1992); see also Startzell v. City of
Philadelphia, 533 F.3d 183, 205 (3d Cir.2008) (stating that a conspiracy

> requires a 'meeting of the minds') (further citation omitted).  This holding
> remains good law following <u>Twombly</u> and <u>Iqbal</u>, which, in the
> conspiracy context, require 'enough factual matter (taken as true) to
> suggest that an agreement was made,' in other words, 'plausible grounds
> to infer an agreement.'  <u>Twombly</u>, 550 U.S. at 556, 127 S.Ct. 1955, 167
> L.Ed.2d 929."  <u>Great W. Mining & Mineral Co. v. Fox Rothschild LLP</u>,
> 615 F.3d 159, 178 (3d Cir.2010) <u>cert. denied</u>, —— U.S. ——, 131 S.Ct.
> 1798, 179 L.Ed.2d 655 (U.S.2011).  We are mindful of these pleading
> requirements, which are considered together with the standards of
> pleading applicable to all civil actions in federal court as defined in
> <u>Twombly</u> and <u>Iqbal, supra</u>.

<u>Victor v. Huber</u>, No. 3:12-CV-282, 2012 WL 7463723, at *14 (M.D. Pa. Nov. 29,

2012) <u>report and recommendation adopted sub nom. Victor v. Hubbard</u>, No. 3:12-CV-

00282, 2013 WL 704654 (M.D. Pa. Feb. 26, 2013).

Here the Anginos' civil conspiracy allegations fail to meet these basic requisites

for a valid civil conspiracy cause of action for at least three reasons.

First, "Pennsylvania law mandates that 'absent a civil cause of action for a

particular act, there can be no cause of action for civil conspiracy to commit that act.'

<u>Goldstein v. Phillip Morris, Inc.</u>, 854 A.2d 585, 590 (Pa.Super.Ct.2004) (quoting

<u>McKeeman v. Corestates Bank</u>, 751 A.2d 655, 660 (Pa.Super.Ct.2000)).  A plaintiff

charging civil conspiracy must therefore 'plead or develop a[ ] separate underlying

intentional or criminal act that can support a civil conspiracy claim.' <u>Id</u>." <u>Accurso v.</u>

<u>Infra-Red Servs., Inc.</u>, 23 F. Supp. 3d 494, 512 (E.D. Pa. 2014).  Here, we have found

that the Anginos' substantive breach of contract claim fails as a matter of law on

multiple scores.   Since the plaintiffs' complaint, as currently written, fails to sufficiently "plead or develop a[ ] separate underlying intentional or criminal act that can support a civil conspiracy claim," it follows that this conspiracy claim also fails as a legal matter.

Second, the choices made by the plaintiffs in the course of this litigation now seem to preclude a conspiracy claim against BB&T Bank, the sole defendant now named in this lawsuit.   While the plaintiffs initially identified five individual and institutional defendants in their complaint, they have voluntarily dismissed four of these five defendants.   Thus, at present  BB&T Bank is the only defendant named in the civil conspiracy claim.   This election by the defendants now defeats their conspiracy claim since it is well-settled under Pennsylvania law that "[a] single entity cannot conspire with itself and, similarly, agents of a single entity cannot conspire among themselves." Grose v. Procter & Gamble Paper Products, 2005 PA Super 8, ¶ 7, 866 A.2d 437, 441 (2005); Irish v. Farley, No. 483 EDA 2014, 2015 WL 7573607, at *11 (Pa. Super. Ct. Feb. 3, 2015); Agarwal v. Schuylkill Cty. Tax Claim Bureau, No. 3:CV 09 1921, 2010 WL 5175126, at *6 (M.D. Pa. Aug. 13, 2010), report and recommendation adopted sub nom. Agarwal v. Schuykill Cty. Tax Claim Bureau, No. 3:09 CV 1921, 2010 WL 5175003 (M.D. Pa. Dec. 15, 2010), aff'd sub nom. Agarwal v. Schuylkill Cty. Tax Claim Bureau, 442 F. App'x 733 (3d Cir. 2011); Lilly

v. Boots & Saddle Riding Club, No. 57 C.D. 2009, 2009 WL 9101459, at *6 (Pa. Commw. Ct. July 17, 2009). Given that BB&T Bank cannot conspire with itself, and there are no other named defendants in this conspiracy count of the plaintiffs' complaint, that count fails to satisfy an essential element of any civil conspiracy, the requirement that *two or more persons* act with a common purpose to commit an illegal act or to commit a lawful act by unlawful means or for an unlawful purpose. Weaver v. Franklin County, 918 A.2d 194,202 (2007). In sum, the conspiracy alleged by the Anginos entails a single juridical person, an entity which as a legal matter cannot conspire with itself. Since the conspiracy charge lacks the essential element of concerted unlawful action between two or more actors, this claim fails as a matter of law and should be dismissed.

Finally, this conspiracy claim, which is set forth in wholly conclusory terms, fails as a matter of pleading since: "[b]are conclusory allegations of 'conspiracy' or 'concerted action' will not suffice to allege a conspiracy [and] [t]he plaintiff must expressly allege an agreement or make averments of communication, consultation, cooperation, or command from which such an agreement can be inferred." Flanagan v. Shively, 783 F.Supp. 922, 928 (M.D.Pa.1992). In short, this claim also fails as pleaded by the plaintiffs since we do not know who the alleged conspirators are, what the wrongful objects of the agreement were, and what concerted illegal acts or lawful

acts committed by unlawful means or for an unlawful purpose are alleged to have taken as part of this corrupt agreement.

### C.   The Plaintiffs Are Not Entitled to Extraordinary Injunctive Relief

Our recommendation that this complaint be dismissed, in turn, dictates the path the Court should follow in addressing the Anginos' motions which seek extraordinary injunctive relief in this matter.  (Docs. 16-17.)  As we have noted, these motions are unaccompanied by any brief, but appear to seek a court order which would un-do the prior agreements entered into between these parties between 2013 and 2015; unilaterally impose the Anginos' past expectations arising from prior dealings in 2007 upon the parties; require BB&T to forego rights which it has under its existing agreements with the plaintiffs; and require the bank to continue to extend credit to the plaintiffs, something it is no longer willing to do.

The court should decline the Anginos' invitation to indulge in this breathtaking and sweeping exercise of its equitable jurisdiction.  These motions fail on several scores.  At the outset, while the plaintiffs filed these motions, their pleadings are unaccompanied by any brief, explaining their legal entitlement to this relief.  This failure to file a brief has consequences for the plaintiffs since we are entitled by the Rules of this Court to deem the plaintiffs to have withdrawn a motion when they fail

to properly support that motion by filing a brief in a timely fashion.  See, e.g., Salkeld v. Tennis, 248 F. App'x 341 (3d Cir.2007) (affirming dismissal of motion under Local Rule 7.5); Booze v. Wetzel, 1:12-CV-1307, 2012 WL 6137561 (M.D. Pa. Nov. 16, 2012) report and recommendation adopted, 1:CV-12-1307, 2012 WL 6138315 (M.D. Pa. Dec. 11, 2012); Breslin v. Dickinson Twp., 1:09–CV–1396, 2011 WL 1577840 (M.D.Pa. Apr.26, 2011) Prinkey v. Tennis, No. 09–52, 2010 WL 4683757 (M.D.Pa. Nov.10, 2010) (dismissal under Local Rule 7.5); Griffin v. Lackawanna County Prison Board, No. 07–1683, 2008 WL 4533685 (M.D.Pa.Oct.6, 2008) (dismissal under Local Rule 7.6).  Therefore, as a threshold matter, since the plaintiffs have not made the showing required to secure relief sought in this motions and the motions are not accompanied by a brief which would have explained the plaintiffs' entitlement to relief, as required by the Local Rules, the motions should be deemed withdrawn and denied.

More fundamentally, the motions fail on their merits.  Motions which request preliminary or permanent injunctions seek a special form of relief and require a specific and exacting showing.  Pleadings, like those filed here, which seek extraordinary, or emergency relief, in the form of preliminary injunctions are governed by Rule 65 of the Federal Rules of Civil Procedure and are judged against exacting legal standards.  As the United States Court of Appeals for the Third Circuit has

explained:   "Four factors govern a district court's decision whether to issue a preliminary injunction:  (1) whether the movant has shown a reasonable probability of success on the merits; (2) whether the movant will be irreparably injured by denial of the relief; (3) whether granting preliminary relief will result in even greater harm to the nonmoving party; and (4) whether granting the preliminary relief will be in the public interest."  Gerardi v. Pelullo, 16 F.3d 1363, 1373 (3d Cir. 1994) (quoting  SI Handling Systems, Inc. v. Heisley, 753 F.2d 1244, 1254 (3d Cir. 1985)).  See also Highmark, Inc. v. UPMC Health Plan, Inc., 276 F.3d 160, 170-71 (3d Cir. 2001); Emile v. SCI-Pittsburgh, No. 04-974, 2006 WL 2773261, *6 (W.D.Pa.   Sept. 24, 2006)(denying inmate preliminary injunction).

A preliminary injunction is not granted as a matter of right.  Kerschner v. Mazurkewicz, 670 F.2d 440, 443 (3d Cir. 1982).  It is an extraordinary remedy.  Given the extraordinary nature of this form of relief, a motion for preliminary injunction places precise burdens on the moving party.  As a threshold matter, "it is a movant's burden to show that the 'preliminary injunction must be the only way of protecting the plaintiff from harm.' "  Emile, 2006 WL 2773261, at * 6 (quoting Campbell Soup Co. v. ConAgra, Inc., 977 F .2d 86, 91 (3d Cir.1992)).   Thus, when considering such requests, courts are cautioned that:

"[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." Mazurek v. Armstrong, 520 U.S. 968, 972 (1997) (emphasis deleted).  Furthermore, the Court must recognize that an "[i]njunction is an equitable remedy which should not be lightly indulged in, but used sparingly and only in a clear and plain case." Plain Dealer Publishing Co. v. Cleveland Typographical Union # 53, 520 F.2d 1220, 1230 (6th Cir.1975), cert. denied, 428 U.S. 909 (1977).  As a corollary to the principle that preliminary injunctions should issue only in a clear and plain case, the Court of Appeals for the Third Circuit has observed that "upon an application for a preliminary injunction to doubt is to deny." Madison Square Garden Corp. v. Braddock, 90 F.2d 924, 927 (3d Cir.1937).

Emile, 2006 WL 2773261, at *6.

Accordingly, to sustain their burden of proof that they are entitled to a preliminary injunction under Fed.R.Civ.P. 65, the plaintiffs must demonstrate both a reasonable likelihood of success on the merits, and that they will be irreparably harmed if the requested relief is not granted.  Abu-Jamal v. Price, 154 F.3d 128, 133 (3d Cir. 1998); Kershner, 670 F.2d at 443.  If the movants fail to carry this burden on either of these elements, the motion should be denied since a party seeking such relief must "demonstrate *both* a likelihood of success on the merits and the probability of irreparable harm if relief is not granted." Hohe v. Casey, 868 F.2d 69, 72 (3d Cir. 1989)(emphasis in original), (quoting Morton v. Beyer, 822 F.2d 364 (3d Cir. 1987)).

Further, where the requested preliminary injunction "is directed not merely at preserving the *status quo* but...at providing mandatory relief, the burden on the moving party is particularly heavy." Punnett v. Carter, 621 F.2d 578, 582 (3d Cir. 1980).

In addition, to the extent that the plaintiffs seek a preliminary injunction with some enduring effect, they must show that they will be irreparably injured by the denial of this extraordinary relief. With respect to this benchmark standard for a preliminary injunction, in this context it is clear that:

> Irreparable injury is established by showing that plaintiff will suffer harm that "cannot be redressed by a legal or an equitable remedy following trial." Instant Air Freight Co. v. C.F. Air Freight, Inc., 882 F.2d 797, 801 (3d Cir.1989) ("The preliminary injunction must be the only way of protecting the plaintiff from harm"). Plaintiff bears this burden of showing irreparable injury. Hohe v. Casey, 868 F.2d 69, 72 (3d Cir.), cert. denied, 493 U.S. 848, 110 S.Ct. 144, 107 L.Ed.2d 102 (1989). In fact, the plaintiff must show *immediate* irreparable injury, which is more than merely serious or substantial harm. ECRI v. McGraw-Hill, Inc., 809 F.2d 223, 226 (3d Cir.1987). The case law provides some assistance in determining that injury which is irreparable under this standard. "The word irreparable connotes 'that which cannot be repaired, retrieved, put down again, atoned for ...'." Acierno v. New Castle County, 40 F.3d 645, 653 (3d Cir.1994) (citations omitted). Additionally, "the claimed injury cannot merely be possible, speculative or remote." Dice v. Clinicorp, Inc., 887 F.Supp. 803, 809 (W.D.Pa.1995). An injunction is not issued "simply to eliminate the possibility of a remote future injury ..." Acierno, 40 F.3d at 655 (citation omitted).

Messner, 2009 WL 1406986, at *4 .

In assessing a motion for preliminary injunction, the court must also consider the possible harm to other interested parties if the relief is granted.  Kershner, 670 F.2d at 443.  Finally, a party who seeks an injunction must show that the issuance of the injunctive relief would not be adverse to the public interest.  Emile, 2006 WL 2773261, at * 6 (citing Dominion Video Satellite, Inc. v. Echostar Corp., 269 F.3d 1149, 1154 (10th Cir. 2001)).

Likewise, "in seeking a permanent injunction, '[a] plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that the remedies available at law, such as monetary damages,' prove inadequate to compensate for that injury; (3) that the balance of hardships between the plaintiff and defendant favor equitable relief; and (4) 'that the public interest would not be disserved by a permanent injunction.' eBay Inc. v. MercExchange, LLC, 547 U.S. 388, 391, 126 S.Ct. 1837, 164 L.Ed.2d 641 (2006)."  Chanel, Inc. v. Matos, 133 F. Supp. 3d 678, 689 (D.N.J. 2015).

Judged by these legal benchmarks, the plaintiffs' motions for injunctive relief fail on all scores.  First, the Anginos have not shown a likelihood of success on the merits of their claim.  Quite the contrary, we find that their claims are subject to dismissal as a matter of law and recommend that these claims be dismissed.  Second, there is no showing that damages would not be adequate as a remedy in this case in the event that the plaintiffs were somehow able to state any claim upon which relief

could be granted.  Further, entering an injunction which, in effect, required the bank to continue to extend credit to the plaintiffs on terms defined by the plaintiffs and compelling the bank to forego its legal rights under its loan modification agreements would plainly work a severe and unjustified hardship upon the defendant in this litigation.  Finally, the public's interest would be disserved by the entry of such an injunction.  The premise behind this request for injunctive relief is that the Court can re-write the contractual arrangements between sophisticated parties, compel lenders to forego their rights, and force financial institutions to continue to extend credit to a borrower on terms that the borrower demands.  These are propositions which are breathtaking in their implications, and commercially unreasonable in their reach.  Taken to its logical extreme this notion would wholly undermine confidence in commercial and residential lending markets, since it would suggest that borrowers may default on loan obligations, yet bar lenders from enforcing the terms of these loans, and use the courts to re-write these loan agreements.  If we embraced this suggestion, we would, in effect, undermine confidence in these financial marketplaces by simultaneously eroding certainty in lenders' ability to enforce loan agreements, and creating a heightened, and largely undefined, legal risk for lenders, who would be subject to suit for exercising their rights under mortgage and loan agreements.  Absent extraordinary circumstances, we should decline such a commercially novel, but legally

untenable, invitation, particularly since in its current form the plaintiffs' complaint does not allege well-pleaded facts which would justify this extraordinary course.

In sum, finding that the plaintiffs' motions for injunctive relief fail to satisfy any of the elements required by law for this extraordinary relief, and are unsupported by any brief explaining the entitlement to such relief, these motions should be denied.

## III.   Recommendation

Accordingly, for the foregoing reasons, IT IS RECOMMENDED that the motion to dismiss filed by BB&T Bank (Doc. 12.) be GRANTED and the motions for injunctive relief (Docs. 16 and 17.) filed by the plaintiffs be DENIED.

The parties are further placed on notice that pursuant to Local Rule 72.3:

> Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof.  Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections.  The briefing requirements set forth in Local Rule 72.2 shall apply.  A judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge.  The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own

determination on the basis of that record.  The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

Submitted this 7th day of June 2016.

**_S/Martin C.  Carlson_**

Martin C. Carlson
United States Magistrate Judge